[Cite as *In re N.C.-L*, 2017-Ohio-4255.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                              |   |                                  |
|------------------------------|---|----------------------------------|
|                              | : | JUDGES:                          |
| IN THE MATTER OF: N.C.-L.    | : | Hon. Patricia A. Delaney, P.J.   |
|                              | : | Hon. W. Scott Gwin, J.           |
|                              | : | Hon. Craig R. Baldwin, J.        |
|                              | : |                                  |
|                              | : |                                  |
|                              | : |                                  |
|                              | : | Case No. 17-CA-8                 |
|                              | : |                                  |
|                              | : |                                  |
|                              | : |                                  |
|                              | : | O P I N I O N                    |


CHARACTER OF PROCEEDING:        Civil appeal from the Fairfield County Court
                                of Common Pleas, Juvenile Division, Case
                                No. 2015-AB-037


JUDGMENT:                       Affirmed


DATE OF JUDGMENT ENTRY:         June 12, 2017

APPEARANCES:

For FCCPS                       For Defendant-Appellee
ANGELA J. SEIMER                JACOB P. ORT
437 North Broad Street          13297 Rustic Drive N.W.
Lancaster, OH 43130             Pickerington, OH 43147

Guardian Ad Litem               EDWARD ITAYIM
SHERRIE HUSTEAD                 729 South Third Street
1998 Refugee Street N.E.        Columbus, OH 43206
Millersport, OH 43046

*Gwin, J.,*

{¶1}    Appellant-mother Brianna C.  appeals the November 23, 2016 and February 1, 2017 Judgment Entries of the Fairfield County Court of Common Pleas, Juvenile Division, which terminated her parental rights with respect to her minor child, N.C-L.[1]  (b. Jan. 22, 2007) and granted permanent custody of the child to appellee, Fairfield County Child Protective Services (hereinafter "FCCPS")[2].

*Facts and Procedural History*

{¶2}    On February 27, 2015, FCCPS filed a complaint alleging that N.C-L. and N.C.[3] were dependent children.  The initial concerns of FCCPS for Mother at the time N.C-L. and N.C. were removed from the home included concerns over reports that the children were witnessing Mother engage in sexual activity; concerns over reports that N.C-L. had been a victim of sexual abuse by a man Mother was associating with; concerns regarding mental health issues with respect to N.C-L. and Mother's ability to adequately address these issues; concerns that N.C-L.'s mental health issues were leading to violent and aggressive behaviors; concerns regarding possible drug use by Mother; and concerns over Mother's ability to safely and effectively parent her children.

{¶3}    On May 7, 2015, N.C-L. and N.C. were found to be dependent children and were placed in the temporary custody of FCCPS.

{¶4}    On December 3, 2015, FCCPS filed a complaint alleging that N.R., a younger sibling of N.C-L. and N.C.  was a dependent child.

---

[1] N.C-L. is also referred to in the trial transcript as "NCL" and in the entries of the trial court as "NZ."
[2] N.C-L.'s siblings are the subject of separate appeals.  *See*, *In re: N.C.,* 5th Dist. Fairfield No. 17-CA-9 and *In re: N.R.,* 5th Dist. Fairfield No. 17-CA-10.
[3] N.C. is sometimes referred to as "N.Y.C." and "N.Y." in the trial transcript and court entries.

**{¶5}** On February 16, 2016, N.R. was found to be a dependent minor and was placed in the temporary custody of FCCPS.

**{¶6}** On May 9, 2016, FCCPS filed a Motion requesting permanent custody of N.C-L., N.C. and N.R. On August 9, 2016, Mother filed a letter with the Court that was treated as a Motion for New Counsel, indicating that the mother did not like the manner in which her assigned counsel was handling her case. The Motion was denied by the court. A pretrial on the Motion for Permanent Custody was held on September 21, 2016. The trial on the Motion was held on both October 31 and November 1, 2016.

**{¶7}** Prior to the beginning of the trial, Mother's attorney made an oral motion to withdraw as counsel. Counsel referenced Mother's previous request to have new counsel. Counsel indicated that he and the Mother did not agree with respect to certain issues. Counsel did indicate that he was prepared to proceed with the hearing. Mother indicated that she was not opposed to counsel's request to withdraw. The court denied the motion on the record. The trial court found that at the time of the request, the motion for permanent custody had been filed for over five months. Additionally, more than two months had passed since Mother's motion for new counsel was denied. The court reasoned that counsel and Mother had many opportunities to bring any new issues to the court's attention, including at a pre-trial conference held September 21, 2016. Instead, the request was made on the day of the hearing prior to the start of trial.

*Permanent Custody trial.*

**{¶8}** Mother completed a psychological evaluation on August 27, 2015 with Dr. Elizabeth Flum of Integrated Services for Behavioral Health. The report of the evaluation was issued on September 25, 2015 and admitted as State's Exhibit A.

{¶9}    Mother was approximately two hours late for the appointment with Dr. Flum. Mother called near the time the appointment was to begin and indicated that she would be late due to transportation issues.

{¶10}   As the appointment went on, Mother appeared to become impatient with the process, and gave very quick answers to many of the questions.  Dr. Flum noted this might have been a result of fatigue do to the lateness of the hour brought on by the transportation issues.

{¶11}   Mother stated during the evaluation that N.C-L. was "kind of traumatized — not right in the head, doesn't want to be around me."

{¶12}   Mother was diagnosed with Generalized Anxiety Disorder, Bipolar Disorder, and Self-defeating Personality Disorder with Negativistic (Passive-Aggressive) Personality Traits and Dependent Personality Traits.

{¶13}  Dr. Flum's treatment recommendations for Mother included targeted psychopharmacologic medications with appropriate consultation; individual counseling focusing on mental health issues; a need to increase Mother's understanding of her thoughts and feelings; short-term group therapy; and parenting education including developing and practicing appropriate discipline techniques.

{¶14}  In particular, Dr. Flum noted Mother's struggles with anger and anger outbursts, and noted that she would be concerned if these issues were not addressed.

{¶15}   With respect to Mother's mental health counseling, Mother worked primarily with Sharon Bankes of New Horizons beginning sometime around September 2015.  A treatment plan was developed to address anger, coping skills, conflict resolution, and any other related issues.  Originally, the goal was to schedule weekly sessions. Mother did not attend

these sessions consistently. From September 2015 to March 2016, approximately eight or nine sessions were scheduled. Mother attended only approximately five or six sessions. Mother canceled three sessions.

{¶16} Beginning March 2016, the treatment plan included recommended sessions every two weeks. From March 2016 to October 2016, Mother participated in approximately eight individual counseling sessions with Ms. Bankes. Mother cancelled or otherwise failed to attend approximately seven sessions during that time.

{¶17} On approximately four separate occasions, Ms. Bankes had to discuss with Mother the possibility that she would be terminated from the program due to her attendance issues.

{¶18} Mother acknowledged that she missed counseling appointments. Mother indicated that she missed these for reasons including transportation issues, conflicts with her work schedule, and conflicts with training to receive her STNA license.

{¶19} Ms. Bankes testified that Mother's inconsistent attendance made it more difficult to accomplish goals in her counseling, and at the time of the hearing, Mother had not completed the program, and would need additional counselling.

{¶20} Mother acknowledged that her counseling goals had not been met as of the time of the hearing.

{¶21} With respect to N.C-L.'s mental health counseling, N.C-L. worked with Sharon Kuss of New Horizons. Ms. Kuss originally began working with N.C-L. and Mother in 2014. However, after multiple cancellations or lack of appearances at appointments, the appointments were stopped.

{¶22} In early 2015, Ms. Kuss again began to work with N.C-L. Ms. Kuss wanted to address issues relating to N.C-L. being a victim of sexual abuse, problems with anger outbursts and making threats to others, and overall safety concerns.

{¶23} Ms. Kuss developed a plan in which some sessions would be attended by N.C-L. alone, some by Mother alone, and some by N.C-L. and Mother together.

{¶24} Individually, N.C-L. has made significant progress in his treatment plan since his placement in foster care, and has demonstrated improvements with respect to his mental health and behaviors. These improvements have been limited by Mother's inconsistency in attending appointments. Ms. Kuss testified that it was important to have Mother present at the sessions so long as the goal was reunification with Mother.

{¶25} Mother often failed to attend scheduled sessions. On approximately six occasions from October 2015 to October 2016, Mother missed a scheduled session.

{¶26} On October 14, 2016, Mother attended a session with N.C-L. Prior to that session, Mother had not attended a counseling session with N.C-L. since July 2016 creating a gap of approximately three (3) months.

{¶27} N.C-L. was aware of the appointments in which Mother was scheduled to attend, and would become angry and agitated when Mother did not attend appointments. Additionally, Ms. Kuss testified that N.C-L.'s behavior would get worse after his Mother missed scheduled visitation sessions coordinated by FCCPS.

{¶28} Mother indicated that she missed these appointments for reasons including transportation issues, conflicts with her work schedule and due to training to receive her STNA license.

{¶29} When Mother did attend joint sessions with N.C-L., Mother had difficulty demonstrating appropriate communication with him. Ms. Kiss testified that Mother was at times "very harsh" in her interactions with N.C-L. During one specific session, Mother was encouraged to listen carefully to N.C-L. so she could adequately address his concerns. Mother had difficulty listening to him and was unable to adequately assure him that she would make appropriate changes.

{¶30} FCCPS asked Mother to maintain stable employment and financial stability. Mother was referred to the Bureau of Vocational Rehabilitation, the S.T.A.R.S program, and to Worknet to assist Mother with this goal.

{¶31} Mother testified that she is looking for employment, but would also like to pursue Social Security Income for various physical issues as well as mental health issues including anxiety and depression. Mother's testimony with respect to her employment since the children were removed included many references to various employers and employment agencies, but Mother did not have a strong grasp of her employment history during this period.

{¶32} Mother was unemployed at the time of the trial. Her most recent employment was a job she had from sometime in August 2016 until sometime in September 2016. Prior to that time, Mother had a one-month gap in employment from July 2016 until August 2016. Mother worked for approximately one week in July of 2016.

{¶33} Understandably, Mother did not work for a time before and after the birth of N.R. in November of 2015. However, Mother did not return to work after his birth until approximately April 2016. Mother did not have custody of N.R. during this period.

{¶34}  At one point, Mother left a job with Anchor Hocking in Lancaster after approximately one week.  Mother has had consistent large gaps in employment since the children were removed from the home.

{¶35}  At the time of the hearing, Mother testified that she was looking for employment.  She testified that she would prefer to work in Lancaster, but is exploring employment options in Columbus as well.  Mother does not have a valid driver's license or reliable transportation to consistently attend a job in Columbus.

{¶36}  Mother acknowledged that her employment "has been a little rocky" since the children was removed.

{¶37}  As part of her case plan, Mother is to maintain stable housing.  Mother has lived in the same three-bedroom home in Lancaster since the children were removed.  Her mother lives in the home a well.  At this time, Mother does not have a rent obligation, as a local housing authority subsidizes her housing.  As part of an agreement, Mother pays the electric bill and a portion of other utilities.  On at least one occasion since the children were removed, FCCPS provided Mother with financial assistance with respect to housing related bills.

{¶38}  At one point after the children were removed, Mother was in danger of being evicted for failing to mow her lawn.  Because she did not mow the lawn, the property owner mowed the lawn and charged Mother for the service.  Eventually, a payment plan was reached for Mother to pay for this service.  If Mother has another similar incident, she will be in danger of losing her housing voucher, and given her inconsistent employment, Mother would likely have difficulty maintaining housing.

{¶39} For the most part, Mother has maintained stable housing during the duration of the case, and has been compliant with this portion of her case plan. However, due to some issues with maintaining the home, some concerns exist with respect to the long-term stability of the home.

{¶40} FCCPS referred Mother to Integrated Services for case management services. Mother did not participate in that program, but instead sought services from New Horizons beginning in November 2015. Mother worked with Ms. Crum from New Horizons on a variety of Issues including seeking employment, addressing transportation issues, and improving Mother's ability to manage daily tasks and responsibilities.

{¶41} At one point in June 2016, Ms. Crum provided Mother with a bus pass paid for by New Horizons.

{¶42} For the most part, Mother was consistent in her interactions with Ms. Crum at New Horizons. However, in September and October 2016, Ms. Crum began to have some issues with respect to contacting Mother. Despite working closely with case management services at New Horizons, Mother still does not have stable employment or consistent transportation, and continues to struggle with managing the daily tasks and associated with her case plan including visitation and counseling.

{¶43} Mother's case plan also required her to complete an alcohol and drug assessment, follow all recommendations, and submit to random drug screens in order to demonstrate ongoing sobriety.

{¶44} Mother completed an alcohol and drug assessment with the Recovery Center and was successfully discharged from the program in May 2016.

{¶45} Mother was referred to American Court Services for participation in the random call and screen program. Mother acknowledged that she smoked marijuana on one occasion after the children were removed. Outside of this occasion, Mother has consistently produced negative screens on those occasions when she called and screened.

{¶46} Mother acknowledged that she missed approximately fifty percent of her scheduled screens since the children were removed.

{¶47} Mother was provided with supervised visitation opportunities. Andrea Stedman served as the Visitation Coordinator.

{¶48} For the most part, FCCPS supervised visitation sessions. At times, maternal grandmother supervised visits. On other occasions, visits were supervised by a Mr. or Ms. Green, the parents of K.G. who at one point was the alleged father of N. R. For various reasons, these parties were unable to continue supervising visitation, and FCCPS provided supervised visitation sessions from that point forward.

{¶49} For the most part, since the children were removed, visitation has been scheduled for two times per week for ninety minutes per session. At one time after the birth of N.R. Mother had scheduled visitation with him for an extra session per week, for three sessions with him. Currently, Mother has scheduled visitation with all three children one time per week for two hours per week.

{¶50} FCCPS made efforts to schedule the visitation at a time when Mother could be available and at a time that would fit in with the schedules of the children.

{¶51} Mother failed to consistently attend visitation sessions. For example, Ms. Stedman estimated that from August 2016 through October 2016, Mother attended only fifty percent of scheduled visitation sessions with the children.

{¶52} Ms. Stedman testified that attendance at visitation sessions was an ongoing problem for Mother since the time N.C-L. and N.C. were removed in March 2015 until the time of the hearing. Mother would often contact FCCPS if she was unable to attend a visitation session, but often times this phone call did not occur until after he children had arrived for the visitation. On those occasions in which Ms. Stedman had to notify the children that Mother would not be attending the visitation session, N.C-L. would become visibly angry and would often kick things. N.C. would become upset and would cry.

{¶53} Eventually, due to Mother's inconsistent attendance, FCCPS changed its procedure so that if Mother had not contacted FCCPS by noon to confirm attendance, the visit would be cancelled. Visits were still cancelled after this change in procedure because Mother did not contact FCCPS in a timely manner.

{¶54} Mother testified that she was late for visits or visits were cancelled on some occasions due to employment obligations.

{¶55} On those occasions when Mother did attend scheduled visitation sessions, Mother did not consistently demonstrate appropriate, nurturing conduct with the children. At times during visits, Mother was witnessed demonstrating a lack of interest in N.C-L. and would not respond to his questions.

{¶56} FCCPS referred Mother to the 1,2,3,4 Parents class. Mother completed the class.

{¶57} FCCPS referred Mother to Ms. Stedman, who served as the Parent Educator on Mother's case. In January of 2016, Mother began to attend parenting education sessions with Ms. Stedman. These sessions focused on appropriate discipline, rule setting, and other related parenting issues. Mother worked with Ms. Stedman regularly on parenting issues, and at times, was receptive to Ms. Stedman's suggestions. However, Mother failed to demonstrate consistent improvement with respect to her interactions with the children. Ms. Stedman testified that on some occasions, Mother would initially implement a technique, but over time, Mother would stop utilizing a technique and would need to be reminded. For example, Mother still needed to be reminded at times to show excitement when she first saw the children. On other occasions, Ms. Stedman had to remind Mother to say good-bye to all three of the children at the conclusion of visits.

{¶58} Additionally, as part of the parenting education plan, Mother would often be responsible for planning food or other activities during visits. Mother would often forget to plan these activities prior to visits. During visits, Mother had difficulty implementing parenting techniques in order to manage the demands of all three children. At times during visits, Mother would imply that N.C-L. should watch or take care of N.C. despite instructions from Ms. Stedman that he was too young to do so.

{¶59} Ms. Stedman testified that Mother needs more parenting education, and she would have concerns with Mother's ability to parent all three children on a full-time basis.

{¶60} On November 23, 2016, the magistrate issued findings of fact granting permanent custody of N.C-L. to FCCPS and terminating Mother's parental rights.

**{¶61}** Mother filed her objections to the magistrate's decision on December 7, 2016. The objections were overruled by Judgment Entry filed February 1, 2017.

*Assignments of Error*

**{¶62}** Mother raises four assignments of error,

**{¶63}** "I. THE TRIAL COURT ERRED IN DETERMINING THAT O.R.C. 2151.414(E)(1) APPLIES TO THE APPELLANT MOTHER, BRIANNA C[.]

**{¶64}** "II. THE TRIAL COURT ERRED IN DETERMINING THAT O.R.C. 2151.414(E)(4) IS APPLICABLE TO THE MOTHER BRIANNA C[.]

**{¶65}** "III. THE TRIAL COURT ERRED IN FAILING TO CONSIDER OTHER RELEVANT FACTORS PURSUANT TO O.R.C. 2151.414(E)(16).

**{¶66}** "IV. THE TRIAL COURT ERRED IN FAILING TO GRANT EITHER MOTHER BRIANNA C[.]'S WRITTEN MOTION FOR NEW COUNSEL OR ATTORNEY HERZBERGER'S ORAL MOTION TO WITHDRAW AS COUNSEL."

**Burden of Proof**

**{¶67}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), *quoting Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972). A parent's interest in the care, custody and management of his or her child is "fundamental." Id.; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982). The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist. 1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." Id.

{¶68} An award of permanent custody must be based upon clear and convincing evidence. R.C. 2151.414(B)(1). The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

### *Standard of Review*

{¶69} The Ohio Supreme Court has delineated our standard of review as follows,

> Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. See *Ford v. Osborne*, 45 Ohio St. 1, 12 N.E. 526, *Cole v. McClure*, 88 Ohio St. 1, 102 N.E. 264, and *Frate v. Rimenik,* 115 Ohio St. 11, 152 N.E. 14.

*Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E. 2d 118 (1954). A court of appeals will affirm the trial court's findings "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re Adkins,* 5th Dist. Nos. 2005AP06–0044 and 2005AP07–0049, 2006-Ohio-431, 2006 WL 242557, ¶17.

{¶70} In *Cross*, the Supreme Court further cautioned,

The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.* See *Rice v. City of Cleveland*, 114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478. (Emphasis added).

### Requirements for Permanent Custody Awards

{¶71} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶72} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶73}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

1**. Parental Placement within a Reasonable Time–R.C. 2151.414(E)(1).**

**{¶74}** The court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151 .414(E). The statute also indicates that if the court makes a finding under R.C. 2151.414(E)(1)—(15), the court shall determine the children cannot or should not be placed with the parent. A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. *See In re William S.*, 75 Ohio St.3d 95, 1996–Ohio–182, 661 N.E .2d 738; *In re Hurlow*, 4th Dist. Gallia No. 98 CA 6, 1997 WL 701328 (Sept. 21, 1998); *In re Butcher*, 4th Dist. Athens No. 1470, 1991 WL 62145(Apr. 10, 1991).

**{¶75}** R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the

Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when

able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(16) Any other factor the court considers relevant.

{¶76} R.C. 2151.414(D) requires the trial court to consider all relevant factors in determining whether the child's best interests would be served by granting the permanent custody motion. These factors include but are not limited to: (1) the interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) apply.

{¶77} In this case, the trial court made its permanent custody findings pursuant to R.C. 2151.414(E)(1), (4) and /or (16).

{¶78} As set forth above, the trial court's findings are based upon competent credible evidence. The record includes the recommendation of the guardian ad litem for the child, and the testimony of the witnesses at trial. The trial court was in the best position to determine the credibility of the witnesses.

{¶79} In the case sub judice, the trial court found by clear and convincing evidence that the N.C-L. had been in the temporary custody of a public children services agency for twelve or more months of a consecutive twenty-two month period pursuant to R.C. 2151.414(B)(1)(d). Mother does not challenge the trial court's finding.

{¶80} As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion

for permanent custody. *In re Daltoni*, 5th Dist. Tuscarawas No. 2007 AP 0041, 2007– Ohio–5805. This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody In *re Calhoun*, 5th Dist. No. 2008CA00118, 2008– Ohio–5458, ¶ 45.

{¶81} However, even if we consider Mother's argument concerning N.C-L. we find the trial court did not err in determining the child cannot be placed with Mother at this time or within a reasonable period.

{¶82} Mother failed to regularly visit the children resulting in distress to the children when she missed half of her scheduled visits. Mother failed to support the children as she did not pay her child support order or maintain steady employment. Mother failed to remedy her mental health concerns, to comply with drug testing, to demonstrate improved parenting skills, and to attend N.C-L.'s counseling regularly. Mother was not included in N.C.'s counseling due to her lack of commitment during N.C-L.'s counseling sessions.

{¶83} Mother has serious mental health issues that require significant diligence to maintain in order for her to appropriately parent, and Mother is not consistent with her counseling and treatment. Mother testified that prior to removal, N.C-L. unlocked her door and observed Mother having sex on 30 occasions. Mother did not and has not addressed the lock issue on the door for the wellbeing of the children as she lives in the same location.

{¶84} The evidence demonstrated the successful efforts Mother had made on the case plan. On that point, the evidence demonstrates that any improvement that Mother has made in her life is tentative and, perhaps, temporary, and that she is at risk of relapse.

The trial court found that, regardless of Mother's compliance with aspects of his case plan, she was still not able to be a successful parent to her children.

**{¶85}** In the case of *In re: Summerfield*, 5th Dist. Stark No. 2005CA00139, 2005-Ohio-5523, this court found where, despite marginal compliance with some aspects of the case plan, the exact problems that led to the initial removal remained in existence, a court does not err in finding the child cannot be placed with the parent within a reasonable time.

**{¶86}** Based upon the foregoing, as well as the entire record in this case, the Court properly found N.C-L. could not or should not be returned to Mother within a reasonable time. Despite offering numerous services, Mother was unable to mitigate the concerns that led to the child's removal.

**2. Lack of Commitment – R.C. 2151.414(E)(4).**

**{¶87}** R.C. 2151.414(E)(4) provides,

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

**{¶88}** From August 2016 through October 2016, Mother attended only approximately fifty percent of scheduled visitation sessions. Attendance at visitation sessions was an ongoing problem for Mother since the children were removed in March 2015 until the time of the hearing. When Mother did attend scheduled visitation sessions, Mother did not consistently communicate with the children, and did not consistently demonstrate appropriate, nurturing contact with the children. Mother has not paid her child support order since the children were removed.

**{¶89}** The evidence demonstrates that Mother has not consistently participated in mental health treatment for N.C-L. and N.C., has not maintained stable employment or financial stability, has not effectively utilized case management services to remedy concerns, has not consistently provided drug and alcohol screens. Mother has had consistent large gaps in employment since the children were removed from the home.

**{¶90}** Therefore, based on the aforementioned facts, the trial court did not abuse its discretion when it found by clear and convincing evidence that 2151.414(E)(4) was applicable to Mother.

### 3. Other relevant factors – R.C. 2151.414(E)(16.

**{¶91}** R.C. 2151.414(E)(16) provides that the trial court may consider "Any other factor the court considers relevant."

**{¶92}** Mother contends that the trial court failed to consider that she "lacks the financial resources that would enable her to not have to work outside the home." Mother contends that this requirement renders her ability to comply with the demands of her case plan challenging.

**{¶93}** In the case at bar, the court noted that as of the time of the hearing, Mother had not remedied her transportation issues. Additionally, Mother did not maintain consistent employment throughout the duration of the case. Finally, as of the time of the hearing, Mother had not received her STNA license, and there was no indication that she would in the near future. As Mother was not employed for the majority of time, her argument is not persuasive.

**{¶94}** In the case at bar, the court found several other relevant factors to consider. First, the trial court found that Mother's mental health issues "require

significant diligence to maintain in order for her to appropriately parent." Moreover, Mother failed to consistently attend her own and the children's counselling sessions. N.C-L. observed Mother having sexual relations over thirty times due to not having proper locks on her door. Additionally, the court found that the Mother "did not and has not addressed the lock issue on the door for the wellbeing of the children as she lives in the same location."

**{¶95}** Therefore, based on the aforementioned facts, the trial court did not abuse its discretion when it found by clear and convincing evidence that 2151.414(E)(16) was applicable to Mother.

### 4. Motion to withdraw as counsel.

**{¶96}** In the context of reviewing a claim by the defendant that the trial court abused its discretion by overruling the defendant's request to discharge court appointed counsel and to substitute new counsel for the defendant the courts have taken the approach that the defendant must show a complete breakdown in communication in order to warrant a reversal of the trial court's decision. In *State v. Cowans* (1999), 87 Ohio St.3d 68, 1999-Ohio-250, 717 N.E.2d 298 the Court noted: "[e]ven if counsel had explored plea options based on a belief that Cowans might be guilty, counsel's belief in their client's guilt is not good cause for substitution." "A lawyer has a duty to give the accused an honest appraisal of his case. * * * Counsel has a duty to be candid; he has no duty to be optimistic when the facts do not warrant optimism." *Brown v. United States* (C.A.D.C.1959), 264 F.2d 363, 369 (en banc), *quoted in McKee v. Harris* (C.A.2, 1981), 649 F.2d 927, 932. "'If the rule were otherwise, appointed counsel could be replaced for doing little more than giving

their clients honest advice.'" *McKee,* 649 F.2d at 932, *quoting McKee v. Harris* (S.D.N.Y.1980), 485 F.Supp. 866, 869." Id. at 73, 717 N.E.2d at 304-305.

{¶97} In a similar vein, it has been held that hostility, tension, or personal conflicts between an attorney and a client that do not interfere with the preparation or presentation of a competent defense are insufficient to justify a change in appointed counsel. See *State v. Henness,* 79 Ohio St.3d 53, 65-66, 679 N.E.2d 686(1997). Furthermore, "[m]erely because appointed counsel's trial tactics or approach may vary from that which appellant views as prudent is not sufficient to warrant the substitution of counsel." *State v. Glasure,* 132 Ohio App.3d 227, 239, 724 N.E.2d 1165(1999); *State v. Evans*(2003), 153 Ohio App.3d 226, 235-36, 2003-Ohio-3475 at ¶31, 792 N.E.2d 757,764; *State v. Newland,* 4th Dist. No. 02CA2666, 2003-Ohio-3230 at ¶11.

{¶98} A defendant has no constitutional right to determine trial tactics and strategy of counsel. *State v. Cowans,* 87 Ohio St.3d 68, 72, 717 N.E.2d 298(1999); *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 150; *State v. Donkers,* 170 Ohio App.3d 509, 867 N.E.2d 903, 2007-Ohio-1557, ¶ 183. Rather, decisions about viable defenses are the exclusive domain of defense counsel after consulting with the defendant. Id. When there is no demonstration that counsel failed to research the facts or the law or that counsel was ignorant of a crucial defense, a reviewing court defers to counsel's judgment in the matter. *State v. Clayton,* 62 Ohio St.2d 45, 49, 402 N.E.2d 1189(1980), citing *People v. Miller,* 7 Cal.3d 562, 573-574, 102 Cal.Rptr. 841, 498 P.2d 1089(1972); *State v. Wiley,* 10th Dist. No. 03AP-340, 2004- Ohio-1008, ¶ 21.

{¶99}  Mother has not established that *su*ch a breakdown occurred to warrant appointment of new counsel.  Indeed, our review of the record indicates Mother's counsel was thoroughly prepared.

{¶100} Mother declined the opportunity to specify her objections to her attorney's performance when asked by the trial court during counsel's oral motion to withdraw the day of the permanent custody trial. (1T. at 13-14).

{¶101} In the case at bar, Mother has failed to establish a breakdown in attorney-client relationship of such magnitude as to require the trial court to discharge her court-appointed attorney.

### *Conclusion*

{¶102} For these reasons, we find that the trial court's determination that Mother had failed to remedy the issues that caused the initial removal and therefore the child could not be placed with her within a reasonable time or should not be placed with her was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶103} We further find that the trial court's decision that permanent custody to FCCPS was in the child's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶104} Finally, Mother has failed to establish a breakdown in attorney-client relationship of such magnitude as to require the trial court to discharge her court-appointed attorney.

{¶105} Because the evidence in the record supports the trial court's judgment, we overrule Mother's four assignments of error, and affirm the decision of the Fairfield County Court of Common Pleas, Juvenile Division.

By Gwin, J.,

Delaney, P.J., and

Baldwin, J., concur